FILED

STATE OF NORTH CAROLINA        IN THE GENERAL COURT OF JUSTICE
COUNTY OF FORSYTH     2021 APR 14 P 2: 06 SUPERIOR COURT DIVISION

**Case No. 21 CVS 1293**

FORSYTH CO., C.S.C.

NOVANT HEALTH, INC.

BY   VW

*Plaintiff,*

v.

AMERICAN GUARANTEE AND LIABILITY
INSURANCE COMPANY,

*Defendant.*

**AMENDED COMPLAINT**
**(Jury Trial Demanded)**

## I.     INTRODUCTION

1.     This is an insurance coverage dispute arising out of Novant Health, Inc.'s losses and expenses associated with COVID-19 and related developments.

2.     Novant is a not-for-profit system of physician practices, hospitals, outpatient centers, and other medical services providers.

3.     American Guarantee and Liability Insurance Company agreed to insure Novant from February 1, 2020 to February 1, 2021 in exchange for $2,206,493 in premium, and has collected a significant amount of premium from Novant over the years. (American Guarantee is a subsidiary of Zurich Insurance Group, Ltd. and is referred to here as "Zurich.")

4.     Contrary to the requirements in its policy, Zurich failed to satisfy numerous obligations to Novant.

5.     Zurich drafted the policy to define the "Covered Cause of Loss" as "All risks of direct physical loss of or damage from any cause unless excluded" and to provide broad coverage for a variety of losses and expenses.

6.     Zurich recognized that losses and expenses associated with a virus are covered under its policy. As a result, its initial version of the policy included a "Contamination" exclusion that, subject to specified exceptions and its others terms, barred recovery under certain coverages if the amount sought was the result of a property condition due to the presence of a virus, pollutants, poison, or bacteria, among other things.

7.     Although the "Contamination" exclusion could bar coverage for certain "costs," that exclusion does not apply to the losses and expenses Novant is entitled to under the policy for a variety of reasons.

8.     One of the reasons the "Contamination" exclusion is irrelevant here – for recovery of "costs" or otherwise – is that Zurich modified the exclusion by removing the "virus" reference. This critical change is in an endorsement that Zurich included on pages 115-17 of the 175-page policy.

9.     When responding to Novant's claim, Zurich not only failed to conduct an appropriate investigation, it also misrepresented the policy terms to Novant and sought to deny the claim based on the obsolete "Contamination" exclusion. Zurich claimed that COVID-19 was a "virus" and, therefore, the "Contamination" exclusion barred coverage, ignoring altogether the endorsement deleting the "virus" reference.

10.     Zurich's actions related to the "Contamination" exclusion, among other things, demonstrate its improper handling of Novant's claim. It is one thing to disagree about how policy terms should be interpreted but misrepresenting what the terms *are* is quite another.

11.     Furthermore, Zurich failed to fully investigate Novant's claim. Zurich's "investigation" solely consisted of excessive and repetitive document requests at a time when Novant's operations were under an unparalleled strain due to the urgent challenges of COVID-19

2

patient care. Zurich's requests sought information that would be irrelevant under its (mis)interpretation of the policy. Nevertheless, Zurich refused to narrow its requests and insisted it could not consider Novant's claim at all absent Novant's unconditional and immediate compliance. In other words, Zurich sent Novant down a path of futile pursuit when Novant – and the employees and patients which rely on it – could least afford it.

12. To make matters worse, Zurich's intransigence led to litigation at this time because of a provision in the policy requiring suit to be filed within a specified time period. Novant sought an extension of that limitation. As it has unfortunately done with many other requests from Novant, Zurich ignored this inquiry as well.

13. When confronted with the unprecedented challenges occasioned by COVID-19, Novant stepped up for its patients and its community. Zurich, however, chose a different route and abdicated the good faith duties it owed to its insured. Instead of honoring its commitments, Zurich has obfuscated. It has failed to conduct a reasonable investigation. Zurich has taken positions that have no basis in the policy, the law, or otherwise. This lawsuit follows as a result.

## II.  PARTIES

14. Novant is a corporation organized under North Carolina law and is based out of North Carolina.

15. Zurich is an insurance company.

## III.  JURISDICTION AND VENUE

16. This Court has personal jurisdiction over Zurich because it regularly transacts business in North Carolina.

17. Zurich issued its policy to Novant in North Carolina to insure property located in North Carolina, among other places.

3

18.     Additionally, this Court has personal jurisdiction over Zurich pursuant to N.C.G.S. § 1-75.4 (5) and (10).

19.     This Court is a proper venue pursuant to N.C.G.S. § 1-80 because Novant is a North Carolina resident and suffered losses in North Carolina. Zurich is a foreign corporation and this cause of action arose in Forsyth County.

20.     This case is filed in the appropriate North Carolina trial court division pursuant to N.C.G.S. § 7A-240 and N.C.G.S. § 7A-243 because the amount in controversy exceeds $25,000.

## IV.     BACKGROUND

### A.     Novant's Operations

21.     The Novant network consists of more than 1,600 physicians and 29,000 employees who provide care at approximately 700 locations, including 15 hospitals and hundreds of outpatient facilities and physician clinics.

22.     From preventative and emergency services to rehabilitation care, Novant's facilities provide comprehensive medical care to various communities.

23.     Novant serves communities in the southeast region.

### B.     Novant's Claim

24.     COVID-19 is a deadly communicable disease that, as of February 2021, has infected more than 30 million people and caused more than 555,000 deaths in the U.S. alone. Centers for Disease Control & Prevention (CDC), *Cases in the U.S.*, https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html (providing a running total of COVID-19 cases and deaths).

4

25.    On March 11, 2020, the World Health Organization determined that the coronavirus, which causes COVID-19, constituted a global pandemic.[1]

26.    A pandemic, by definition, is "an epidemic occurring worldwide . . . ." Heath Kelly, *The classical definition of a pandemic is not elusive*, 89 Bulletin of the WHO 7, at 540-41 (2011) (https://www.who.int/bulletin/volumes/89/7/11-088815/en/) (last visited Mar. 19, 2021).

27.    As a declared pandemic, COVID-19 is present globally, including at each Novant location.

28.    COVID-19 is a physical substance that can spread through the respiratory droplets of infected individuals.

29.    Although COVID-19 is "novel," scientists now understand that the virus spreads through three primary modes of transmission.

30.    First, COVID-19 spreads via airborne transmission when an uninfected person inhales droplets of the saliva or nasal discharge released when an infected person speaks, sneezes or coughs. CDC, *How COVID-19 Spreads* (last updated Oct. 28, 2020) (https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads.html) (last accessed Nov. 18, 2020); CDC, *Scientific Brief: SARS-CoV-2 and Potential Airborne*.

31.    Second, smaller droplets, known as aerosols, can linger in the air for hours infecting people over a greater distance and even after the infected person has left the premises.

---

[1] COVID-19 is the disease caused by SARS-CoV-2; COVID-19 is not a virus. World Health Organization, *Naming the coronavirus disease (COVID-19) and the virus that causes it*, https://www.who.int/emergencies/diseases/novel-coronavirus-2019/technical-guidance/naming-the-coronavirus-disease-(covid-2019)-and-the-virus-that-causes-it (announcing the names for the 2019 coronavirus and the disease it causes). The virus and the disease are often referenced interchangeably as "COVID-19." Novant adopts the practice here for ease of reference.

5

Aerosol droplets may even be pulled into air circulation systems and spread to other areas in a building. This kind of spread is referred to as aerosol or airborne transmission.

32.    Aerosol transmission involves the airborne transmission of viral RNA in particles smaller than 50 microns (human hair is about 80 microns), and which do not settle onto surfaces like larger droplets emitted through saliva and nasal discharge. Aerosol transmission typically involves viral RNA emitted through exhaled breath like larger droplets emitted through saliva and nasal discharge. Third, respiratory droplets carrying COVID-19 can land on surfaces and objects, where they can remain viable for hours or days, rendering the surface or object unsafe and dangerous for continued use, because they may infect another person who comes into contact with one of these surfaces or objects. A person can get COVID-19 by touching a surface or object that has the virus on it and then touching his or her own mouth, nose, or eyes.

33.    In other words, COVID-19 can attach to and cause lasting damage to property.

34.    Despite Novant's various efforts, infected individuals have presented at all Novant locations as patients, vendors, visitors, employees, or other guests.

35.    The CDC has recommended preventative and control practices in healthcare settings to prevent the spread of COVID-19 as much as possible. CDC, *Interim Infection Prevention and Control Recommendations for Healthcare Personnel During the Coronavirus Disease 2019 Pandemic* (updated Dec. 14, 2020), https://www.cdc.gov/coronavirus/2019-ncov/hcp/infection-control-recommendations.html.

36.    Due to the risks associated with COVID-19, physical alteration of property is necessary to render the property safe from COVID-19 and to return the property to a safe and useable state. For instance, according to the CDC, healthcare providers should use engineering

6

controls like physical barriers, vacuum shrouds during surgical procedures likely to generate aerosols, remote triage stations, optimization of air-handling and ventilation systems, and more.

37.     Novant has adopted and implemented these and other preventative and remedial measures in order to combat COVID-19 and the related physical loss and damage, incurring significant extra expense.

38.     These measures include screening patients, turning over the air in operating rooms, installing air scrubbers and intubation boxes, and setting up respiratory assessment centers and field hospitals, among others.

39.     Despite its efforts, Novant has not resumed its full operations and continues to incur extra expense combating COVID-19 and the related physical loss and damage.

40.     Given the nature of Novant's operations, among other reasons, the presence of COVID-19 on real and personal property at Novant locations causes a tangible alteration to that property. It can change the property, including air and the surfaces, rendering the affected property unsafe, unfit and uninhabitable for ordinary functional use.

41.     Experts have determined that COVID-19 is a communicable disease that impacts and physically damages property because persons on site with COVID-19 shed the SARS-CoV-2 virus into the air and surfaces. This results in tangible physical transformation of the air and surfaces, rendering them dangerous transmission vehicles for the potentially deadly disease. The impact and physical damage caused by persons with COVID-19 is not temporary and is sustained through any occupation of the property. Routine cleaning and disinfection alone are insufficient to remediate the loss or damage.

42.     Epidemiologists have determined that individuals with COVID-19 alter the physical characteristics of surfaces and the air of occupied spaces where those individuals are

7

present with respiratory secretions and aerosols. As a result, those altered surfaces and air of become vehicles for COVID-19 transmission.

43.    Under normal operating conditions, there is no effective way to fully repair or remediate the physical loss or damage caused by COVID-19 to properties like Novant's, because COVID-19 is constantly reintroduced to the property.

44.    Short of complete closure, which is impossible because Novant provides emergency and other essential services, implementation of strict administrative and operational controls that, among other things, limit the number of persons at a location, are the only effective ways to attempt to repair or remediate the physical loss or damage caused by COVID-19 and protect against further loss or damage from COVID-19. Mere cleaning and disinfecting of the property and the indoor air does not repair or remediate the actual physical and tangible alteration to property caused by COVID-19.

45.    This is particularly the case with property accessible to the public, where attempts to remove COVID-19 from the property does not fully repair or remediate the physical damage and tangible alteration to property due to the continuous reintroduction of COVID-19 to the property.

46.    The effects of COVID-19 on healthcare facilities like Novant are multi-factorial and include "increases in patients seeking care for respiratory illness that could be COVID-19, deferring and delaying non-COVID-19 care, disruptions in supply chains, fluctuations in facilities' occupancy, absenteeism among staff because of illness or caregiving responsibilities, and increases in mental health concerns." CDC, *Healthcare Facilities: Managing Operations During the COVID-19 Pandemic* (updated Dec. 22, 2020), https://www.cdc.gov/coronavirus/2019-ncov/hcp/guidance-hcf.html.

8

47.     Government authorities and agencies have also recognized the effect of COVID-19 on healthcare providers, including the physical loss and damage to providers' property caused by COVID-19, and have issued orders that affect Novant's operations (the "Orders").

48.     The Orders have also caused Novant to completely suspend or slow down its operations.

49.     For instance, Novant was forced to suspend various elective procedures, leading to the cancellation of thousands of procedures and the inability to use its property for its intended purpose.

50.     The distinct, demonstrable, physical change, and tangible alteration to property that directly caused the issuance of the Orders includes, among other things, the ability of COVID-19 to attach to surfaces for prolonged periods, remain viable in indoor air, and render property unsafe for normal use, and the loss of functionality and reliability of property caused by COVID-19 when it transforms air and property into a dangerous and potentially deadly instrumentality.

51.     Because COVID-19 regulations and the Orders remain in effect, Novant has not been able to resume its full operations. Novant experienced direct physical loss or damage to property due to COVID-19 and the Orders.

52.     Novant sent the initial notice of its claim to Zurich on March 23, 2020 and reported additional details about its losses in subsequent submissions.

C.      **The Policy**

53.     Zurich issued policy number ZMD8591943-01 to Novant for the period of February 1, 2020 to February 1, 2021.

54.     The policy includes Zurich's "EDGE" coverage form. Zurich represented that, compared to other kinds of policies it and other insurers could issue, the "EDGE" form provided

9

"broader coverage and greater flexibility" and offered "significant advantages" for certain policyholders, like Novant.

55.     The policy contains the following insuring agreement:

> This Policy Insures against direct physical loss of or damage caused by a **Covered Cause of Loss** to Covered Property, at an Insured Location described in Section II-2.01, all subject to the terms, conditions and exclusions stated in this Policy.

(Policy § 1.01; N-000014.) A copy of the policy is attached as Exhibit A and is bates stamped N-000001 to N-000175.[2]

56.     The policy defines a **Covered Cause of Loss** as "All risks of direct physical loss of or damage from any cause unless excluded." (Policy, § 7.11; N-000061.)

57.     An Insured Location is a **Location** listed on Schedule of Locations. (Policy, § 2.01; N-000015.)

58.     The policy contains the following with respect to Time Element losses:

> [Zurich] will pay for the actual Time Element loss the Insured sustains, as provided in the Time Element Coverages, during the Period of Liability. The Time Element loss must result from the necessary **Suspension** of the Insured's business activities at an Insured Location...
>
> [Zurich] will also pay for the actual Time Element loss sustained by the Insured, during the Period of Liability at other Insured Locations... The Time Element loss must result from the necessary **Suspension** of the Insured's business activities at the other Insured Locations...

(Policy § 4.01; N-000026.)

59.     The policy defines a **Suspension (Suspended)**, in relevant part, as "The slowdown or cessation of the Insured's business activities." (Policy, § 7.58.01; N-000066.)

---

[2] Certain terms in the policy are bolded, and they are bolded here as well.

60.     The policy contains several additional coverages, which provide additional protection to Novant. The coverages include Extra Expense, Civil or Military Authority, Contingent Time Element, Ingress or Egress, Protection and Preservation of Property, and Interruption by Communicable Disease, among others.

61.     The policy does not exclude losses related to COVID-19, communicable disease, or pandemics.

62.     Some insurance companies do include exclusions for losses arising out of any virus.

63.     Zurich drafted the policy, but decided not to include such an exclusion in the policy.

64.     Zurich expressly included **"Structural Damage"** as a prerequisite to recover under certain coverages. (Policy, N-000099.)

65.     The **"Structural Damage"** requirement does not apply to the coverages that Novant is relying on here.

**D.     The Insurance Industry and Zurich Knew of the Risks and Dangers of the Pandemic and the Potential for Coverage**

66.     Insurers, like Zurich, are in the business of risk. Insurers have a wide range of actuarial risk measures available to them to determine the potential and magnitude of catastrophic risks. They also have several tools at their disposal to manage exposure to any given risk, including premium adjustments and reinsurance. Pandemics are among the risks insurers have and can plan for and adjust their operations accordingly.

67.     The industry has been aware for years of the potential impact of pandemics. It has been a frequent subject of industry articles, speeches, and conferences. For example:

11

a. In 2015, the Center for Insurance Policy and Research held an event titled "The Risk of Pandemics to the Insurance Industry" to explore the risk of pandemics to the health, life, and property and casualty industries. Among the "key takeaways" was the potential for "business continuity/business interruption/extra expense loss," meaning "Insurance companies must properly implement appropriate planning and response protocols before and during the event." The Risk of Pandemics to the Insurance Industry: Lessons Learned from the 2015 CIPR Symposium Applicable to COVID-19 (Apr., 15, 2020).

b. One article from March 2018 noted: "Even with today's technology, a modern severe pandemic would cause substantive direct financial losses to the insurance community. In addition, indirect losses would be severe, most notably on the asset side of the balance sheet."[3]

c. The Insurance Library Association of Boston (founded in 1887) lists on its website at least 15 articles, reports, and white papers available to insurers from early 2007 through 2018.[4] The Association states on its website: "The past 20 years has seen the rise of a number of pandemics. Slate recently published an article on what has been learned about treating them in that time. We thought it might be apt for us to take a look back and see what the insurance industry has learned as well." The webpage then lists

---

[3] See "What the 1918 Flu Pandemic Can Teach Today's Insurers," AIR (Mar. 29, 2018) (https://www.air-worldwide.com/publications/air-currents/2018/What-the-1918-Flu-Pandemic-Can-Teach-Today-s-Insurers/) (last visited Mar. 19, 2021).
[4] See https://insurancelibrary.org/2020/02/07/pandemics-and-insurance/ (last visited Mar. 11, 2021).

various articles and reports discussing the risks and impacts of pandemics on the insurance industry. For example, an article from 2014 stated that pandemics "can have a significant impact on life and health insurance portfolios, and, depending on contract terms, could also affect other lines such as workers' compensation, **business interruption**, travel and event cancellation and disability insurance."[5] Nita Madhav, "Travel Sickness: Pandemic Risk Models Show Diseases Move More Quickly and with Greater Impact in our Connected World," *Best's Review*, 115 no. 8 (Dec. 1, 2014) (emphasis added).

68.     Moreover, over the course of decades, courts have held that the presence of a hazardous substance at or on a property, including the airspace inside buildings, constitutes property damage. Many courts have also held that the closure of property due to imminent risk of physical loss or damage or danger to inhabitants constitutes physical loss of property. Upon information and belief, insurers, including Zurich, have been and continue to be aware of these court decisions.

69.     After the SARS outbreak in 2002-2003, in which insurers paid business interruption losses, the insurance industry undertook to draft an exclusion for virus-related losses.

70.     A circular that accompanied the exclusion explained to state insurance regulators the potential for viruses to cause direct physical losses and damage leading to business interruption claims:

---

[5] *See* Nita Madhav, "Travel Sickness: Pandemic Risk Models Show Diseases Move More Quickly and with Greater Impact in our Connected World," *Best's Review*, 115 no. 8 (Dec. 1, 2014) (emphasis added).

Case 1:21-cv-00309-CCE-JLW   Document 8   Filed 04/16/21   Page 13 of 31

Disease-causing agents may render a product impure (change its quality or substance), or enable the spread of disease by their presence on interior building surfaces or the surfaces of personal property. *When disease-causing viral or bacterial contamination occurs, potential claims involve* the cost of replacement of property (for example, the milk), cost of decontamination (for example, interior building surfaces), and *business interruption (time element) losses.*

(Emphasis added.)

71.     At all relevant times, Zurich has been aware of this exclusion for virus-related losses. In fact, Zurich included this exclusion in policies it issued for other companies. Zurich decided to not include this exclusion in the policy issued to Novant.

## V.     INSURANCE COVERAGE

### A.     The Policy's "All Risks" Coverage Is Triggered

72.     COVID-19 has been present in or around all Novant locations since March 2020, when COVID-19 first presented in the United States and Novant began treating COVID-19 patients.

73.     Additionally, both employees and patients have tested positive for COVID-19 at all testing centers and acute care locations.

74.     As described above, COVID-19 can attach to surfaces and remain in the air causing physical loss or damage to property.

75.     Patients and employees infected with COVID-19 have been at Novant locations frequently, regularly, and consistently over the course of this pandemic.

76.     While on-site, individuals infected with COVID-19 shed SARS-CoV-2 (the causative agent of COVID-19) into the indoor air and onto surfaces throughout the property.

14

77.     As a result of this shedding, infectious SARS-CoV-2 particles remain suspended in the indoor air and present on surfaces (both of which are covered property under the policy) at Novant locations.

78.     Due to the high volume of patients and others at Novant locations and the high prevalence of infection among the patients Novant has treated and continues to treat, COVID-19 and SARS-CoV-2 has been present at Novant's properties.

79.     The presence of COVID-19 in the air and on surfaces causes physical loss and damage to the property by causing a physical alteration of the air and surfaces from a safe and functional condition to an unsafe and non-functional condition, preventing normal operations consistent with Novant's practices before the pandemic.

80.     The presence of COVID-19 at Novant locations has resulted in direct physical loss or damage and has prevented operations under the same or similar physical and operating conditions that existed before the pandemic.

81.     The "all risks" coverage is triggered.

82.     COVID-19 is not excluded under the policy.

83.     In addition to the policy's "all risks" coverage, COVID-19 and the Orders trigger other coverages under the policy, including, but not limited to, the coverages addressed below.

**B.      Time Element Coverages**

84.     Zurich agreed to insure the Time Element loss.

85.     Novant suffered and continues to suffer Time Element loss due to the necessary **Suspension** of business activities at Insured Locations because of the direct physical loss or damage caused by COVID-19.

15

### C.   Extra Expense

86.   The policy insures "the reasonable and necessary Extra Expenses incurred" during the Period of Liability. (Policy, § 4.02.03; N-000028.)

87.   These expenses include the cost "to resume and continue as nearly as practicable the Insured's normal business activities that otherwise would be necessarily suspended, due to direct physical loss of or damage." (Policy, § 4.02.03; N-000028.)

88.   Novant incurred and continues to incur extra expenses to resume and continue as nearly as practicable its normal business activities. For example, Novant has incurred expenses for personal protective equipment that is more than the amount it would incur during normal operations.

89.   The expenses are over and above the expenses that Novant would have normally incurred had there been no direct physical loss of or damage caused by COVID-19.

### D.   Civil or Military Authority

90.   The policy insures the Time Element loss "resulting from necessary **Suspension** of the Insured's business activities . . . if the **Suspension** is caused by order of civil or military authority that prohibits access to the Location." (Policy, § 5.02.03; N-000032-33.)

91.   The order must result from a civil authority's response to direct physical loss of or damage to non-insured property and located within one mile of an insured location. (Policy, § 2.03.08; N-000017.)

92.   Numerous Orders have been issued since March 2020 in response to the physical loss of or damage caused by COVID-19 to non-insured property within one mile of Novant's insured locations.

93.   The Orders have prohibited access to Novant locations and resulted in the necessary suspension of business activities.

16

94.     Novant has experienced loss from the Orders.

**E.     Contingent Time Element**

95.     The policy insures "the actual Time Element loss sustained due to the necessary **Suspension** of business activities directly resulting from direct physical loss of or damage caused by a **Covered Cause of Loss** to property at **Direct Dependent Time Element Locations, Indirect Dependent Time Element Locations,** and **Attraction Properties**…" (Policy, § 5.02.05; N-000033.)

96.     The policy defines **Direct Dependent Time Element Locations**, in relevant part, as: "Any **Location** of a direct: customer, supplier, contract manufacturer or contract service provider to the Insured." (Policy, § 7.16.01; N-000062.)

97.     The policy defines **Indirect Dependent Time Element Locations**, in relevant part, as: "Any **Location** of a company that is a direct: customer, supplier, contract manufacturer or contract service provider to a **Direct Dependent Time Element Location**; or Any **Location** of a company that is an indirect: customer, supplier, contract manufacturer or contract service provider to a **Direct Dependent Time Element Location**." (Policy, §§ 7.25.01-02; N-000063.)

98.     The policy defines **Attraction Properties** as properties located within one mile "of an Insured Location that attract customers to the Insured's business." (Policy, §§ 2.03.08 and 7.04; N-000017 and N-000060.)

99.     Novant has suffered Contingent Time Element loss covered by the policy.

100.    For example, Novant's regular source for protective gowns is located in Wuhan, China. The Wuhan plant stopped its operations and closed due to the presence of coronavirus on its property and in the region and loss or damage at its property. As such, Novant was not able to secure protective gowns from its regular supplier and had to secure gowns from elsewhere.

17

When Novant was able to secure supplies, those costs were in excess of its ordinary operating expenses.

**F.    Ingress or Egress**

101.    The policy insures the actual Time Element loss "resulting from the necessary **Suspension** of the Insured's business activities at an Insured Location if ingress or egress to that Insured Location by the Insured's suppliers, customers or employees is prevented by physical obstruction due to direct physical loss of or damage caused by a **Covered Cause of Loss** to property" not insured under the policy and located within one mile of an Insured Location. (Policy, §§ 5.02.15 and 2.03.08; N-000037 and N-000017.)

102.    Novant has suffered Time Element loss of the type insured due to physical obstruction of ingress or egress to Novant locations.

**G.    Protection and Preservation of Property**

103.    The policy insures the "reasonable and necessary costs incurred for actions to temporarily protect or preserve Covered Property; provided such actions are necessary due to actual or imminent physical loss or damage." (Policy, § 5.02.24.01; N-000041.)

104.    This provision is triggered because Novant incurred substantial costs for actions taken to protect its Covered Property.

105.    These actions were necessary due to the actual and imminent physical loss or damage caused by COVID-19.

106.    The policy insures certain "Gross Earnings loss sustained by the Insured…." (Policy, § 5.02.24.02; N-000041.)

107.    This provision is triggered because Novant suffered Gross Earnings loss that is subject to recovery under the policy.

18

**H.    Interruption by Communicable Disease**

108.    The policy insures loss caused by an order of an authorized governmental agency regulating communicable disease and such portions of the location are declared uninhabitable due to the threat of the spread of communicable disease. (Policy, § 5.02.35; N-000045.)

109.    The policy extends coverage to "the reasonable and necessary cost incurred for the cleanup, removal and disposal of the actual not suspected presence of substances(s) causing the spread of such communicable disease and to restore the locations in a manner so as to satisfy such authorized governmental agency." (Policy, § 5.02.35; N-000045.)

110.    COVID-19 is a communicable disease.

111.    The policy thus recognizes communicable disease as a Covered Cause of Loss.

112.    Coverage is triggered because Novant experienced loss due to the Orders regulating communicable disease that rendered portions of Novant locations uninhabitable due to the threat of spread.

**I.    No Exclusion Applies**

113.    The "all risks" coverage applies unless there is a specific exclusion. (Policy, § 7.11; N-000061.)

114.    No exclusion applies to preclude coverage for Novant's losses.

115.    Nonetheless, Zurich refused to provide Novant coverage for the claim, citing certain exclusions.

116.    In its denial, Zurich cited the **Contamination** exclusion, which excludes "**Contamination**, and any cost due to **Contamination**." (Policy, § 3.03.01.01; N-000023.)

117.    An endorsement supersedes and replaces the exclusion as follows:

> SECTION III – PROPERTY DAMAGE, C. EXCLUSIONS, paragraph 3.03.01.01.is deleted in its entirety and replaced by the following:

19

3.03.01.01. Contamination or asbestos, and any cost due to Contamination or asbestos including the inability to use or occupy property or any cost of making property safe or suitable for use or occupancy.

(Policy, Form EDGE-219-C (01/18); N-000115.)

118.  The endorsement also replaces the definitions of **Contamination(Contaminated)**

[sic] and **Contaminant(s)**:

11. The following is deleted from SECTION VII – DEFINITIONS

**Contamination(Contaminated)** - Any condition of property due to the actual presence of any foreign substance, impurity, pollutant, hazardous material, poison, toxin, pathogen or pathogenic organism, bacteria, virus, disease causing or illness causing agent, **Fungus**, mold or mildew.

and replaced by the following:

**Contamination(Contaminated)** - Any condition of property due to the actual presence of any **Contaminant(s)**.

12. The following is deleted from SECTION VII – DEFINITIONS:

**Contaminant(s)** - Any solid, liquid, gaseous, thermal or other irritant, pollutant or contaminant, including but not limited to smoke, vapor, soot, fumes, acids, alkalis, chemicals, waste (including materials to be recycled, reconditioned or reclaimed), asbestos, ammonia, other hazardous substances, **Fungus** or **Spores**.

And replaced with the following:

**Contaminant(s)** - Any solid, liquid, gaseous, thermal or other irritant, including but not limited to smoke, vapor, soot, fumes, acids, alkalis, chemicals, waste (including materials to be recycled, reconditioned or reclaimed), other hazardous substances, **Fungus** or **Spores**.

(Policy, Form EDGE-219-C (01/18); N-000117.)

119. The endorsement references Louisiana in its title. However, the policy makes clear that titles of endorsements must be disregarded and "shall not in any way affect the provisions" of the endorsements. (Policy § 6.20; N-000057.)

120. For policy endorsements that apply only to Novant locations in specific jurisdictions, the policy expressly says so.

121. For example, the endorsement titled as "Amendatory Endorsement – New York" states that "THIS ENDORSEMENT CHANGES THE POLICY AND APPLIES TO THOSE RISKS IN NEW YORK." (Policy; N-0000140.) Likewise, the endorsement titled as "Amendatory Endorsement – Connecticut" states that "THIS ENDORSEMENT CHANGES THE POLICY AND APPLIES TO THOSE RISKS IN CONNECTICUT." (Policy; N-000092.)

122. Before issuing the policy, Zurich knew that Novant did not have any Louisiana locations when it issued the policy with this endorsement.

123. By its own terms, the contamination exclusion does not apply for multiple reasons, including the following. The amounts for which Novant seeks coverage are covered under the Time Element section of the policy, and the contamination exclusion does not apply to that section of the policy. In addition, even if it applied to that section of the policy, the exclusion provides that the policy does not cover "contamination, and any cost due to contamination." Novant is not asking Zurich to cover "contamination." Novant asks Zurich to provide coverage for losses and expenses. The limited scope of the contamination exclusion is apparent when compared to other exclusions in the policy that exclude "loss or damage directly or indirectly caused by or resulting from the following regardless of any other cause or event, whether or not insured under this Policy, contributing concurrently or in any other sequence to the loss." (Policy, § 3.03.03; N-000024.)

21

124. Further, Zurich has used different versions of the amendatory endorsement.

125. Another version of the same amendatory endorsement states that it "only applies to locations in Louisiana." Zurich could have used this same language or a similar provision in Novant's policy.

126. The amendatory endorsement in Novant's policy does not include this language or any similar phrase that geographically limits the endorsement's application.

127. Other endorsements in Novant's policy specify that they apply to certain locations only. None of those endorsements are relevant for Novant's claim at issue here.

128. Thus, the endorsement applies to all Novant locations covered under the policy.

129. In its denial, Zurich cited another exclusion that applies to "Loss or damage arising from the enforcement of any law, ordinance, regulation or rule regulating or restricting the construction, installation, repair, replacement, improvement, modification, demolition, occupancy, operation or other use, or removal including debris removal of any property." (Policy, § 3.03.01.03; N-000023.)

130. That exclusion does not apply because the Orders affecting Novant's operations do not regulate or restrict "the construction, installation, repair, replacement, improvement, modification, demolition, occupancy, operation or other use, or removal including debris removal of any property," are not laws or ordinances, and there was no enforcement against Novant of any such law or ordinance.

131. In its denial, Zurich cited this exclusion: "Loss or damage arising from delay, loss of market, or loss of use." (Policy, § 3.03.02.01; N-000023.)

132. That exclusion does not apply because Novant's losses are not due to delay, loss of market, or loss of use.

22

133. Zurich also cited this exclusion: "Loss or damage resulting from the Insured's suspension of business activities, except to the extent provided by this Policy." (Policy, § 3.03.02.05; N-000023.)

134. Novant is seeking coverage for the suspension of business activities, but the amounts Novant seeks are covered by the policy. Thus, the exclusion does not apply to Novant's claim here.

135. Finally, Zurich cited this exclusion:

> Any loss during any idle period that would have been experienced had the **Suspension** of business activities not occurred. This includes, but is not limited to, when production, operation, services, delivery or receipt of goods or services or any other business activities would have ceased, or would not have taken place or would have been prevented due to…Any reason other than physical loss or damage insured by this Policy.

(Policy, § 4.02.05.01.01.3; N-000029.)

136. Since the amounts Novant seeks to recover are due to physical loss or damage insured by the policy, this exclusion does not apply.

137. Zurich's denial of Novant's claim was incorrect and without reasonable justification.

## VI. COLLATERAL ESTOPPEL

138. The issues and defenses to coverage that Zurich has raised for Novant's claim have also been relied on by its affiliates and other related companies. For instance, Zurich has asserted – and is expected to raise in this litigation – that Novant's claim does not satisfy the requirement in the policy for "direct physical loss of or damage caused by a **Covered Cause of Loss** to Covered Property…." (Policy § 1.01; N-000014.) Zurich's affiliates and other related

23

companies have raised the same issue and defense in connection with claims submitted by other policyholders.

139. Courts have rejected the issues that Zurich has asserted and is expected to raise in this litigation.

140. For example, Henderson Road Restaurant Systems, Inc., dba Hyde Park Grille sought to recover amounts due under a policy issued by Zurich American Insurance Company ("Zurich American") under a claim materially similar to Novant's claim. When Zurich did not acknowledge coverage, Henderson sued Zurich American in the United States District Court for the Northern District of Ohio.

141. Certain policy provisions at issue in the Henderson case are identical to or materially similar to the provisions in Novant's policy. For instance, the physical loss of or damage to requirement in the policy issued to Henderson and Novant's policy is the same.

142. Zurich and Zurich American are affiliates or otherwise related companies.

143. Based upon information and belief, the handling of COVID-19 insurance claims by Zurich and Zurich American are directed by the same group of individuals.

144. Based upon information and belief, with respect to the handling of COVID-19 insurance claims, Zurich and Zurich American are in privity with each other.

145. Notwithstanding that Zurich and Zurich American are two different companies, with respect to the handling of COVID-19 insurance claims, there is no difference between them that is material to the common issues in the Henderson case and this litigation.

146. Based upon information and belief, Zurich and Zurich American constitute the same entity for all practical purposes relevant to the Henderson claim and Novant's claim.

24

147. In their litigation, Henderson and Zurich American filed competing motions for summary judgment. A copy of the summary judgment briefs is attached as Exhibits B, C, D, E, F, and G.

148. The Henderson court granted Henderson's motion, in relevant part, and denied Zurich American's motion in its entirety. A copy of the decision is attached as Exhibit H.

149. Zurich American had a full and fair opportunity to litigate the issues raised in the summary judgment motions filed in the Henderson lawsuit.

150. In its ruling, the Henderson court rejected Zurich's position on some of the issues that Zurich has asserted and is expected to raise in this litigation and that Zurich raised in the Henderson case. For instance, the Henderson court found that the requirement of physical loss of or damage to property was satisfied, contrary to Zurich's position in that case. That ruling is at odds with Zurich's position for Novant's claim.

151. Based upon the Henderson court's decision, Zurich is collaterally estopped from raising the same or similar issues that it raised in that litigation and that the court rejected.

### VII. ZURICH ACTED IN BAD FAITH

152. Zurich owes a duty of good faith to Novant under the policy and North Carolina law.

153. Zurich breached it duties by acting without reasonable justification, including by wrongfully denying Novant's claim and failing to make any efforts to perform its obligations, including failing to conduct a reasonable investigation of Novant's claim.

154. Instead, Zurich asked Novant to respond to extensive and burdensome requests for information even though Zurich had no intention of ever actually considering or adjusting Novant's claim.

25

155.    This is evidenced by Zurich's view that the presence of COVID-19 would not constitute direct physical loss of or damage to property as required by the policy. Because Zurich's position is at odds with the policy language and numerous studies and literature, which Zurich is aware of and will be further established in discovery, Novant asked for the basis for Zurich's conclusion, an inquiry Zurich has ignored.

156.    Notwithstanding its position about COVID-19, Zurich specifically asked Novant: "If COVID-19 was present at any of your properties, did you sustain any direct physical damage to real property? If so, please provide a detailed description of what was damaged and how?"

157.    It is hard to see how Novant's answer to Zurich's question would affect Zurich's coverage position if it had already concluded that the presence of COVID-19 does not constitute direct physical loss of or damage to property and that exclusions applied.

158.    Zurich also relied on the policy's un-amended version of the contamination exclusion and the definitions of "**Contamination (Contaminated)**" and "**Contaminant(s)**", explaining that "[t]he presence of the COVID-19 virus [sic] falls within the [un-amended] definition of **Contamination**." This was a misrepresentation that Zurich made to mislead Novant in an effort to improperly deny coverage provided under the policy. The letter failed to quote the amended, *operative* exclusion and definitions. Zurich did not accurately represent the terms of the contamination exclusion or its application to Novant's claim.

159.    Novant requested clarification of Zurich's coverage position so that it would be better able to identify and home in on information responsive to Zurich's inquiries.

160.    In the spring of 2020, Novant's operations were under an unparalleled strain due to the urgent challenges of COVID-19 patient care. Refocusing any part of this energy towards

26

responding to Zurich's broad requests was not a realistic option, but narrower requests may have been accommodated.

161.    Six weeks later, Zurich declined to either narrow its requests or provide its coverage position, saying that it would "not engage in a discussion regarding coverage in a vacuum." Zurich instead inquired about the status of Novant's claim information, including a spreadsheet that Zurich had sent after receiving Novant's May 21, 2020 letter. Zurich insisted that its "investigation and adjustment of the claim [could not] move forward in any fashion until Novant provide[d] such information."

162.    The spreadsheet sought the "type of business conducted at each location in the claim and which locations were open, or partially open, and why any were closed, or partially closed."

163.    Novant has nearly 700 locations.

164.    Nonetheless, Novant provided this list and further documentation of its claim and answered Zurich's other broad requests for information.

165.    Obtaining this location list and responses to the questionnaire constituted the entirety of Zurich's claims investigation, and Zurich inexplicably ignored Novant's questions about the basis for its positions that eventually led to the denial of the claim.

166.    Zurich delayed its coverage determination for over eight months before it denied Novant's claim.

167.    By failing to conduct a reasonable, timely investigation of the claim, and by failing to respond to Novant's inquiries, Zurich failed to treat Novant fairly or honestly in performing its duties under the policy.

168.    Zurich's bad faith caused and continues to cause Novant damages.

27

## COUNT I: BREACH OF CONTRACT

169.   Novant repeats and realleges the allegations in the preceding paragraphs.

170.   The policy is a valid, enforceable contract between Novant and Zurich.

171.   Novant has satisfied all of the policy's applicable terms, conditions, and requirements, including payment of premium.

172.   In the alternative, Zurich waived any right to insist upon compliance with the policy's terms, conditions, or requirements and any right to contest coverage.

173.   COVID-19, the COVID-19 pandemic, and the Orders trigger the policy's coverage.

174.   No exclusions apply to the amounts Novant seeks.

175.   Thus, Novant is entitled to coverage for its losses and expenses arising out of COVID-19, the Orders, and the resulting physical loss of or damage to property.

176.   Zurich breached the contract by refusing to pay Novant for its losses and expenses in breach of the policy.

177.   Zurich's breach of the policy caused and continues to cause Novant damages.

178.   Novant is entitled to damages because of Zurich's breach of contract in an amount to be determined at trial, including pre- and post-judgment interest and any other costs and relief that this Court deems appropriate.

## COUNT II: BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING

179.   Novant repeats and realleges the allegations in the preceding paragraphs.

180.   Zurich owes a duty of good faith to Novant under the policy and applicable law.

181.   Zurich breached that duty by acting without reasonable justification.

28

182.    Zurich acted in bad faith by failing to pay Novant's claim and by failing to investigate the claim after being presented with evidence of loss.

183.    Zurich acted in bad faith by misrepresenting the terms of the policy and attempting to mislead Novant into believing that there was no coverage for its claim.

184.    Zurich's bad faith acts and denial caused and continue to cause Novant damages.

185.    Novant is entitled to damages because of Zurich's breach of the covenant of good faith and fair dealing in an amount to be determined at trial, including pre- and post-judgment interest and any other costs and relief that this Court deems appropriate.

## COUNT III: VIOLATION OF NORTH CAROLINA'S UNFAIR AND DECEPTIVE TRADE PRACTICES LAWS

186.    Novant repeats and realleges the allegations in the preceding paragraphs.

187.    Zurich's acts constitute unfair and deceptive trade practices under N.C.G.S. § 75-1.1 and § 58-63-15(11).

188.    Zurich misrepresented pertinent facts or insurance policy provisions relating to the coverages at issue in violation of N.C.G.S. § 58-63-15(11)(a).

189.    Zurich failed to adopt and implement reasonable standards for the prompt investigation of claims in violation of N.C.G.S. § 58-63-15(11)(c), because Zurich failed to conduct any meaningful investigation of Novant's claim.

190.    Zurich denied Novant's claim without conducting a reasonable investigation based upon all available information in violation of N.C.G.S. § 58-63-15(11)(d).

191.    Zurich's systematic denial of Novant's claim without any investigation is unethical, oppressive, and/or substantially injurious to consumers.

192.    Therefore, Zurich acted unfairly or deceptively and in bad faith in violation of North Carolina law.

29

193.     Zurich's unfair or deceptive acts occurred in or affected commerce.

194.     Zurich's violations of North Carolina's unfair and deceptive trade practice laws proximately caused and continue to cause Novant damages.

195.     Novant is entitled to damages because of Zurich's violations of North Carolina's unfair and deceptive trade practice laws in an amount to be determined at trial, including pre- and post-judgment interest and any other costs and relief that this Court deems appropriate.

## VIII.  PRAYER FOR RELIEF

Novant requests the Court enter judgment as follows:

(1)     Novant be awarded its damages resulting from Zurich's breach of the policy, including pre-judgment and post-judgment interest;

(2)     Novant be awarded damages resulting from Zurich's breach of the covenant of good faith and fair dealing, including consequential, punitive, exemplary, and treble damages;

(3)     Novant be awarded damages resulting from Zurich's acts in violation of North Carolina's unfair or deceptive practice law, including consequential, punitive, exemplary, and treble damages;

(4)     Novant be awarded its reasonable attorneys' fees and court costs; and

(5)     Novant be awarded such other and further relief, general, special or consequential, at law or in equity, to which it may be justly entitled.

## <u>DEMAND FOR JURY TRIAL</u>

Novant demands trial by jury on all issues so triable.

30

April 14, 2021

Respectfully submitted,

A. Todd Brown, Sr.
N.C. Bar No.: 13806
Hunton Andrews Kurth LLP
One South at The Plaza, Suite 3500
101 South Tryon Street
Charlotte, NC 28280
Telephone: 704-378-4727
tbrown@HuntonAK.com

Syed S. Ahmad*
Hunton Andrews Kurth LLP
2200 Pennsylvania Avenue, NW
Washington, DC 20037-1701
Telephone: 202-955-1656
sahmad@HuntonAK.com

* *Pro hac vice* motion to follow

*Attorneys for Novant Health, Inc.*