IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| NOVANT HEALTH INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:21-CV-309 |
| | ) | |
| AMERICAN GUARANTEE AND LIABILITY INSURANCE COMPANY, | ) ) ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Catherine C. Eagles, District Judge.

This is an insurance coverage case brought by the insured, Novant Health Inc., against defendant-insurer, American Guarantee and Liability Insurance Company. Novant has made claims under an insurance policy with AGLIC for certain losses arising from the COVID-19 pandemic, and AGLIC has not paid those claims. Novant has adequately alleged physical losses and AGLIC has not established at this stage that the virus exclusion applies, so AGLIC's Rule 12(b)(6) motion will be denied. AGLIC's motion to dismiss Novant's claim under the communicable disease provision on ripeness grounds will also be denied, as AGLIC cannot complain when an insured complies with policy language requiring an insured to bring suit within one year of a loss.

I. Overview

Novant Health is a network of healthcare centers comprising "approximately 700 locations, including 15 hospitals and hundreds of outpatient facilities and physician

clinics." Doc. 8 at ¶ 21. AGLIC insured Novant via an all-risk policy in place from February 1, 2020, to February 1, 2021. *Id.* at ¶¶ 3, 5.

Like every person and entity in the United States, Novant has been affected by the COVID-19 pandemic. It seeks to recover various losses under the AGLIC policy, which provides coverage for "direct physical loss or damage" and "interruption by communicable disease." AGLIC contends that the complaint fails to state a claim for physical loss and that any such coverage is excluded by an exclusion directed to losses caused by virus. As to communicable disease coverage, AGLIC contends that this part of the lawsuit should be dismissed because it is not ripe.

## II. Direct Physical Loss of or Damage to Property

### A. Collateral Estoppel

Novant contends that the coverage issue for direct physical losses caused by COVID-19 has been resolved against a party in privity with AGLIC in *Henderson Rd. Rest. Sys., Inc. v. Zurich Am. Ins.*, 513 F. Supp. 3d 808 (N.D. Ohio 2021), so that AGLIC is collaterally estopped from contesting coverage. Collateral estoppel "forecloses the relitigation of issues of fact or law that are identical to issues which have been actually determined and necessarily decided in prior litigation in which the party against whom collateral estoppel is asserted had a full and fair opportunity to litigate." *In re Microsoft Corp. Antitrust Litig.*, 355 F.3d 322, 326 (4th Cir. 2004) (quoting *Sedlack v. Braswell Servs. Grp., Inc.*, 134 F.3d 219, 224 (4th Cir.1998)) (cleaned up).

Federal courts apply the forum state's law of collateral estoppel. *Kremer v. Chem. Constr. Corp.*, 456 U.S. 461, 481–82 (1982); *In re McNallen*, 62 F.3d 619, 624 (4th Cir.

2

1995). Under North Carolina law, collateral estoppel can be applied only if several factors are met, including, *inter alia*, that "the issues to be precluded are the same as those involved in the prior action." *U.S. Fire Ins. v. Se. Airmotive Corp.*, 102 N.C. App. 470, 472, 402 S.E.2d 466, 468 (Ct. App. 1991) (quoting *King v. Grindstaff*, 284 N.C. 348, 358, 200 S.E.2d 799, 806 (1973)). In *Henderson Rd.*, the court applied Ohio law to interpret the insurance contract at issue. 513 F. Supp. 3d at 819. Here, the case involves application of North Carolina law. Thus, the issue litigated in *Henderson Rd.* is not the same as the issue in this case. Novant has not satisfied the first requirement of collateral estoppel under North Carolina law. *U.S. Fire Ins.*, 102 N.C. App. at 472.

### A. Rule 12(b)(6) motions.

As is appropriate at this stage, facts are taken from the amended complaint, Doc. 8, and are assumed to be true for the purposes of the motion. A Rule 12(b)(6) motion to dismiss "tests the sufficiency of a complaint," and the Court's "evaluation is thus generally limited to a review of the allegations of the complaint itself." *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 165–66 (4th Cir. 2016). The Court may also consider exhibits to a complaint if there is no challenge to authenticity. *Id.* at 166; *see also* FED. R. CIV. P. 10(c). Here, the amended complaint quotes from and makes numerous references to the Policy, Doc. 8 at 9–11, 16–23, and the amended complaint includes the Policy as Exhibit A. Doc. 26-1. Neither party has disputed its authenticity.

In North Carolina, an insurance policy is a contract, and its terms are interpreted in fundamentally the same manner as contract terms: the goal is to arrive at the intent of the parties when the policy was issued. *Woods v. Nationwide Mut. Ins.*, 295 N.C. 500, 505,

3

246 S.E.2d 773, 777 (1978). The insured carries "the burden of bringing itself within the insuring language of the policy. Once it has been determined that the insuring language embraces the particular claim or injury, the burden then shifts to the insurer to prove that a policy exclusion excepts the particular injury from coverage." *Prod. Sys., Inc. v. Amerisure Ins.*, 167 N.C. App. 601, 605, 605 S.E.2d 663, 665 (Ct. App. 2004); *Nationwide Mut. Fire Ins. v. Allen*, 68 N.C. App. 184, 188, 314 S.E.2d 552, 554 (Ct. App. 1984)).

"Exclusions from coverage provided by the policy are strictly construed, and when language which is reasonably susceptible of differing construction is used in the policy, it must be given the construction most favorable to the insured." *Van Sumner, Inc. v. Pennsylvania Nat. Mut. Cas. Ins.*, 74 N.C. App. 654, 657, 329 S.E.2d 701, 703 (Ct. App. 1985) (citing *Wachovia Bank & Trust Co. v. Westchester Fire Ins.*, 276 N.C. 348, 172 S.E.2d 518 (1970)).

### B. Coverage[1]

The Policy "insures against direct physical loss of or damage caused by a Covered Cause of Loss to Covered Property . . . subject to the terms, conditions and exclusions stated in this Policy." Doc. 26-1 at 15 (Policy § 1.01). "Covered Cause of Loss" is defined as, "All risks of direct physical loss of or damage from any cause unless excluded." *Id.* at 62 (Policy § 7.11).

---

[1] For ease of reading, when quoting the Policy the Court has not included the use of bolded font that is present for certain words and phrases in the Policy. For similar ease of reading, the Court has not used some capitalization present in the Policy and has deleted phrases and language irrelevant to the pending motion when quoting Policy language.

4

Novant alleges that the COVID-19 virus exists and is spread by human beings into the air and on surfaces, Doc. 8 at ¶ 42, and that it "results in tangible physical transformation of the air and surfaces, rendering them dangerous transmission vehicles" for the disease. *Id.* at ¶ 41. The "impact and physical damage" caused by the presence of COVID-19 "is not temporary;" instead, it is "sustained through any occupation of the property," and the damage is not fully remediated by "[r]outine cleaning and disinfection alone." *Id.* Because of the nature of its health care operations, the presence of the COVID-19 virus on Novant's real and personal property "causes a tangible alteration to that property" that "can change the property, including air and the surfaces" so that the property is "unsafe, unfit and uninhabitable for ordinary functional use." *Id.* at ¶ 40. According to Novant, COVID-19 "transforms air and property into a dangerous and potentially deadly instrumentality," *id.* at ¶ 50; government authorities have recognized that COVID can cause physical loss and damage to the property of health care providers, *id.* at ¶ 47; and the virus has caused such physical loss and damage to Novant. *See, e.g.*, *Id.* at ¶¶ 36-38, 49, 88.

"Direct physical loss" is not defined in the Policy. Even before the pandemic, courts struggled with defining physical loss in insurance policies where the policy left the term undefined, in cases involving asbestos, lead, bacteria, harmful gases, and more.[2] The lone North Carolina case most directly addressing the meaning of "direct physical

---

[2] *See* Scott G. Johnson, *What Constitutes Physical Loss or Damage in A Property Insurance Policy?*, 54 TORT TRIAL & INS. PRAC. L.J. 95 (2019) (collecting cases and discussing courts' differing interpretations of physical loss as sometimes extending beyond demonstrable, structural alteration, to include loss of the property's use, functionality, or reliability).

5

loss" was decided at summary judgment, when the facts were more clearly developed. *Harry's Cadillac-Pontiac-GMC Truck Co. v. Motors Ins.*, 126 N.C. App. 698, 702, 486 S.E.2d 249, 251–52 (Ct. App. 1997) (holding there was no coverage where insured's losses were caused by its inability to access its building because of a snowstorm, not from damage to the building caused by the snowstorm).

In *Summit Hosp. Grp., Ltd. v. Cincinnati Ins.*, a court applying North Carolina law dismissed a similar case brought by a hospital against its insurer for COVID-19 related losses at the Rule 12(b)(6) stage, but the allegations in that complaint were quite different. There, the court noted that it "need not decide whether the presence of the coronavirus would satisfy the policy's requirement for direct physical damage or loss because plaintiff has not alleged that COVID-19 was discovered in any of its covered properties." *Summit Hosp.*, No. 5:20-CV-254-BO, 2021 WL 831013, at *4 (E.D.N.C. Mar. 4, 2021) (appeal filed). Similarly, in the recent *Golden Corral Corp. v. Ill. Union. Ins.*, the court dismissed a restaurant chain's claim against its insurer for COVID-19 related losses at the Rule 12(c) stage, but there the plaintiff alleged no need for repair, replacement, or even cleaning. No. 5:20-CV-349-D, 2021 WL 4097684, at *8 (E.D.N.C. Sept. 8, 2021). Here, Novant has alleged that COVID-19 is present and continually re-introduced to its properties, despite its best efforts, and that COVID-19 has caused physical damage and losses potentially covered by the Policy. *E.g.*, Doc. 8 at ¶ 34.

Whether COVID-19 has resulted in direct physical damage or loss to Novant, and if so to what extent, are questions better evaluated on a developed factual record. Novant has adequately alleged direct physical damage or loss, and dismissal on this basis is

6

inappropriate at the Rule 12(b)(6) stage. *See generally Elegant Massage, LLC v. State Farm Mut. Auto. Ins.*, 506 F. Supp. 3d 360, 372–76 (E.D. Va. 2020) (noting in a case under Virginia law that "while the [plaintiff's business] was not structurally damaged, it is plausible that Plaintiff's [sic] experienced a direct physical loss when the property was deemed uninhabitable, inaccessible, and dangerous to use by the Executive Orders because of its high risk for spreading COVID-19, an invisible but highly lethal virus.").

### C. The Virus Exclusion

Section 3.03 of the Policy states that "[t]his policy excludes . . . Contamination, and any cost due to Contamination." Doc. 26-1 at 24 (Policy §§ 3.03.01-3.03.01.01). "Contamination" is defined as "[a]ny condition of property due to the actual presence of any . . . virus." *Id.* at 62 (Policy § 7.09). As the parties appear to agree, if this language is part of the policy, it excludes coverage. *See, e.g.*, *Natty Greene's Brewing Co. v. Travelers Cas. Ins. Co. of Am.*, 503 F. Supp. 3d 359, 363–64 (M.D.N.C. 2020); *Julie's Inc. v. Hanover Ins. Grp., Inc.*, No. 1:20CV853, 2021 WL 2312532, at *5 (M.D.N.C. June 7, 2021); *Cali Fresh, LLC v. Twin City Fire Ins.*, No. 1:20CV522, 2021 WL 3620074, at *7 (M.D.N.C. Aug. 16, 2021).

But there is a question as to whether the virus exclusion is part of the policy. In one of many Amendatory Endorsements appended to and thus apparently part of the Policy, the contamination exclusion is deleted and replaced by a version which does not include a virus exclusion. Doc. 26-1 at 118.

AGLIC contends that this "Amendatory Endorsement" only applies to claims connected to Louisiana in some unspecified way. The Court appreciates that there are

7

some textual indications that this endorsement only applies to claims having something to do with Louisiana; it does contain the heading "Amendatory Endorsement – Louisiana." *Id.* at 116. Indeed, in other factual scenarios a number of courts have held that similar provisions applied only to claims with a connection, often unidentified, to Louisiana.[3]

But there are other "Amendatory Endorsements" followed by the names of states which by their terms—not just their headings—only apply to claims in a particular state: "This endorsement changes the policy and applies to those risks in Connecticut. Please read it carefully," and "[t]his endorsement changes the policy and applies to those risks in New York. Please read it carefully." *Id.* at 93–96 (Connecticut), 141–144 (New York). Unlike the pages with "New York" and "Connecticut" in the titles, the Amendatory Endorsement on which Novant relies does not contain any statement in the text that it is limited to claims or property in Louisiana. *Id.* at 116. Indeed, it explicitly says, without any limitation at all, that "[t]his endorsement changes the policy. Please read it carefully." *Id.* at 116.[4] *See e.g., John Akridge Co. v. Travelers Companies*, 837 F. Supp.

---

[3] *See, e.g., Manhattan Partners, LLC v. Am. Guarantee & Liab. Ins.*, No. 20-14342 (SDW) (LDW), 2021 WL 1016113, at *2 n.3 (D.N.J. Mar. 17, 2021) (appeal pending); *Boscov's Dep't Store, Inc. v. Am. Guarantee & Liab. Ins.*, No. 5:20-CV-03672-JMG, 2021 WL 2681591, at *9 (E.D. Pa. June 30, 2021).

[4] At the end of the Policy, AGLIC appended over seventy pages of what it calls "amendatory endorsements." Doc. 26-1 at 90-176. Each of the 31 endorsements has the heading "Amendatory Endorsement," followed by a dash and the name of a particular state. *See, e.g., id.* at 90 (labelled "Amendatory Endorsement – Alaska"); at 93 (labelled "Amendatory Endorsement – Connecticut"). All contain the provision "[t]his endorsement changes the policy," and direct the insured to "[p]lease read it carefully." *See, e.g., id.* at 90 (Alaska). Two Amendatory endorsements—New York and Connecticut—explicitly apply to risks in the named state. *Id.* at 93, 141 ("This endorsement changes the policy and applies to those risks in Connecticut.") *id.* at 93–96; ("This endorsement changes the policy and applies to those risks in New York.") *id.* at

8

6, 8 (D.D.C. 1993) (applying endorsement titled "Maryland Changes" to claims outside Maryland because "no language in the endorsement limits its application to insured property located in Maryland"); *Arch Specialty Ins. v. Cline*, No. 10-2114-STA-DKV, 2012 WL 12823706, at *7 (W.D. Tenn. Dec. 4, 2012) (applying endorsement titled "New York Amendatory Endorsement" to claim outside New York since "nowhere in the Subject Policy or the endorsement is the endorsement limited to applicability solely in New York State. Rather, even above the title 'New York Amendatory Endorsement' the endorsement proclaims in bold, capital letters that '[t]his endorsement changes the policy'").

The cases cited by AGLIC do not reflect whether the so-called "state-specific endorsements" at issue in those cases did or did not contain language explicitly limiting their application to claims arising in those states; here, of course we have some that do and some that don't. And the policy itself provides that "titles . . . shall not in any way affect the provisions to which they relate," Doc. 26-1 at 58 (Policy § 6.20), undermining AGLIC's contention that the title "Amendatory Endorsement – Louisiana" limits the meaning of the text of the endorsement that it "change[s] the policy."

---

141–144. The rest do not contain similar language or limitations. None of the "Amendatory Endorsements" have "North Carolina" after the dash. The final page of the policy, after other endorsements without a state name, is a page entitled "North Carolina – Notice of Certain Causes of Loss Not Covered," *Id.* at 176, which purports to constitute a warning required by North Carolina law when a policy does not cover losses from floods, earthquakes, windstorms, and similar events. It is not relevant here.

9

In any event, AGLIC's cases are otherwise distinguishable. In *Tomars v. United Fin. Cas. Co.*, for example, at issue was a commercial general liability policy covering a fleet of vehicles across the country; the court found it appropriate to enforce "a series of state-specific endorsements conforming its coverages to the requirements imposed by the insurance laws of the states in which particular vehicles are located." No. 12-CV-2162 (JNE/HB), 2015 WL 3772024, at *3 (D. Minn. June 17, 2015). Here, there is nothing in the complaint to indicate that Novant has property in the 31 states listed in the headings of the various Amendatory Endorsements; indeed, the parties have not directed the Court's attention to anything in the complaint or policy identifying any "insured location," Doc. 26-1 at 16 (Policy § 2.01), outside North Carolina.[5] Nor is this a case involving rental property that can be moved at will from one state to another, as in *Kamp v. Empire Fire & Marine Ins.*, 570 F. App'x 350, 351 (4th Cir. 2014).

AGLIC asserts that the Amendatory Endorsements contain terms contradicting each other and it would be nonsensical to apply all of these endorsements to all claims. But AGLIC does not explain why it included 74 pages of irrelevant and immaterial words in Novant's policy, for no reason apparent on the record. And the general rule in North Carolina is that if an insurance company includes contradictory provisions in a policy, those provisions are "resolved against the insurer and in favor of the policyholder." *Silvers v. Horace Mann Ins.*, 90 N.C. App. 1, 10, 367 S.E.2d 372, 377 (Ct. App.

---

[5] In evidence outside the pleadings, and thus inappropriate to consider in connection with a Rule 12(b)(6) motion, there is some indication that Novant has locations in a small number of adjoining states. *See* Doc. 23-1 at 209.

1988), *aff'd as modified,* 324 N.C. 289, 378 S.E.2d 21 (1989) (holding the conflict between two provisions in the policy must be resolved in favor of the insured); *see Woods,* 295 N.C. at 506, 246 S.E.2d at 777.

AGLIC has the burden to show the exclusion applies. *Allstate Ins. v. Lahoud*, 167 N.C. App. 205, 208, 605 S.E.2d 180, 182–83 (Ct. App. 2004) ("The insurer bears the burden of proving that an exclusion is applicable."), *aff'd*, 359 N.C. 628, 614 S.E.2d 304 (2005). The Court is not ruling that the virus exclusion does not apply, but in view of the contradictory language in the Policy, AGLIC has not met its burden at this stage of the proceedings.

### III. Interruption by Communicable Disease Coverage

The Policy contains provisions providing coverage when the insured's business is interrupted by a communicable disease; the parties refer to this as "ICD Coverage." AGLIC has not asserted that this provision requires physical loss or damage or that the virus exclusion applies to ICD coverage. Instead, AGLIC contends this claim should be dismissed because it is not ripe for resolution. Specifically, AGLIC asserts that it has not yet denied Novant's ICD claim. Novant contends the matter is ripe because the Policy itself requires Novant to file suit within a year of filing its claim, and it filed this lawsuit close upon the one-year mark.

"Like standing, the ripeness doctrine originates in the 'case or controversy' constraint of Article III." *Edgar v. Haines*, 2 F.4th 298, 311 (4th Cir. 2021) (citing *South Carolina v. United States*, 912 F.3d 720, 730 (4th Cir. 2019)); U.S. Const. art. 3, § 2, cl. 1. Just as standing contemplates "*who* may sue, ripeness considers *when* they may

11

sue." *Edgar*, 2 F.4th at 311. And like standing, ripeness is a question of subject matter jurisdiction. *See Sansotta v. Town of Nags Head*, 724 F.3d 533, 548 (4th Cir. 2013) (citation omitted). Whether a claim is ripe depends upon the "fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *South Carolina*, 912 F.3d at 730 (cleaned up) (ultimately quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967)).

A controversy that is ripe for judicial review is one presented in a "clean-cut and concrete form." *Miller v Brown*, 462 F.3d 312, 319 (4th Cir. 2006) (citation omitted). A claim is unripe "if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Scoggins v. Lee's Crossing Homeowners Ass'n*, 718 F.3d 262, 270 (4th Cir. 2013) (quoting *Texas v. United States*, 523 U.S. 296, 300 (1998)).

When defendants dispute "the veracity of the facts underpinning subject matter jurisdiction," courts may look beyond the complaint to resolve disputed jurisdictional facts, with exceptions not relevant here. *Kerns v. United States*, 585 F.3d 187, 193 (4th Cir. 2009); *United States ex rel. Vuyyuru v. Jadhav*, 555 F.3d 337, 348 (4th Cir. 2009); *accord Save Ardmore Coal. v. Lower Merion Twp.*, 419 F. Supp. 2d 663, 669 (E.D. Penn. 2005) (citing *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977)) ("In a factual attack, the defendant challenges the court's jurisdiction based on evidence outside the pleadings and the court may review and rely upon any evidence in assessing jurisdiction."). "The plaintiff has the burden of proving that subject matter jurisdiction exists." *Evans v. B.F. Perkins Co.*, 166 F.3d 642, 647 (4th Cir.1999).

The Policy has a provision requiring the insured to file suit against AGLIC "within (12) twelve months after the date of direct physical loss or damage to covered property . . ." Doc. 26-1 at 56 (Policy § 6.13.05) (parentheses in original). While the exact date Novant's losses began is not completely clear, Novant appears to assert that that its losses began on March 11, 2020, when the World Health Organization determined that the coronavirus causing COVID-19 constituted a global pandemic. *See generally* Doc. 8 at ¶ 25. AGLIC has not disputed this general timeframe.

Novant sent its initial notice of claim to AGLIC around March 23, 2020. *Id.* at ¶ 52; *see also* Doc. 23-1 at 192 (AGLIC letter noting receipt of claim on March 24, 2020). AGLIC then asked for more information on several occasions. *See, e.g.*, Doc. 23-1 at 1–5, 184, 199.

On February 24, 2021, Novant asked AGLIC to extend the time to file suit. Doc. 28-1 at ¶ 3. AGLIC did not agree to any extension. *Id.* at ¶ 7. Novant filed suit in state court on March 10, 2021. Doc. 1 at ¶ 1. As of that date AGLIC had not paid the ICD claim, nor had it denied the claim. Doc. 23-1 at p. 5 ¶ 16.

AGLIC does not explain why the provision requiring Novant to file suit within one year of damage does not apply, nor does it explain what an insured should do in the face of the twelve-month deadline and an unpaid claim. AGLIC included the provision requiring that suit be filed within one year, and it cannot object when an insured follows the Policy requirement. AGLIC has not paid the claim, and Novant waited to file suit until approximately one day before the one-year deadline AGLIC imposed and only after asking AGLIC for an extension and receiving no response. The dispute is ripe.

13

## IV. Good Faith Claim and Chapter 75 Claim

AGLIC's primary argument in support of dismissal of the good faith and Chapter 75 claims is that the underlying breach of contract claims are without merit. The Court has rejected those arguments, for the time being, so that is not a basis for dismissing these claims. Novant's allegations are otherwise sufficient to raise plausible claims.

It is **ORDERED** that:

1. The defendant's motion to dismiss, Doc. 21, is **DENIED**.

2. The plaintiff's motion to file a sur-reply, Doc.33, is **GRANTED**.

This the 23rd day of September, 2021.

_____
UNITED STATES DISTRICT JUDGE